## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| C. R. BARD, INC. AND BARD PERIPHERAL VASCULAR, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civ. No. 15-218-SLR |
| ANGIODYNAMICS, INC., | ) ) ) |
| Defendant. | ) |

John G. Day, Esquire, Tiffany Geyer Lydon, Esquire, and Andrew C. Mayo, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Vincent J. Belusko, Esquire and Nicole M. Smith, Esquire of Morrison & Foerster LLP.

Richard L. Horwitz, Esquire, David E. Moore, Esquire, and Stephanie E. O'Byrne, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Christopher A. Hughes, Esquire, Regina M. Lutz, Esquire, Danielle V. Tully, Esquire, and Michael B. Powell, Esquire of Cadwalader, Wickersham & Taft LLP.

## MEMORANDUM OPINION

Dated: January 12, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On March 10, 2015, plaintiffs C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.

("collectively, "plaintiffs") filed this patent suit against defendant, alleging infringement of

U.S. Patent Nos. 8,475,417 (the "'417 patent"), 8,545,460 (the "'460 patent"), and

8,805,478 (the "'478 patent") (collectively, "the patents-in-suit") by certain implantable

power-injectable port products, including Smart Port® products. (D.I. 1)  Presently

before the court are defendant's motion to dismiss (D.I. 9) and motion to transfer (D.I.

11), as well as plaintiffs' motion for leave to file a sur-reply in response to defendant's

reply in support of its motion to dismiss (D.I. 22).  The court has jurisdiction pursuant to

28 U.S.C. §§ 1331 and 1338(a).

## II. BACKGROUND

C. R. Bard, Inc. is a corporation organized and existing under the laws of the

State of New Jersey with its principal place of business in Murray Hill, New Jersey.

Bard Peripheral Vascular, Inc. (a subsidiary of C. R. Bard, Inc.) is a corporation

organized and existing under the laws of the State of Arizona with its principal place of

business in Tempe, Arizona.  Defendant is a corporation organized under the laws of

the State of Delaware with its principal place of business in Latham, New York.  (D.I. 1

at ¶¶ 3-5)

The '417 patent is titled "Assemblies for Identifying a Power Injectable Access

Port" and issued July 2, 2013.  The '460 patent is titled "Infusion Apparatuses and

Related Methods" and issued October 1, 2013.  The '478 patent is titled "Methods of

Performing a Power Injection Procedure Including Identifying Features of a

Subcutaneously Implanted Access Port for Delivery of Contrast Media" and issued August 12, 2014. Plaintiffs assert infringement of claims 8, 12, and 13 of the '417 patent, claims 1, 2, and 4 of the '460 patent, and claims 1, 3, 5, 8, 9, and 11 of the '478 patent. (D.I. 1 at ¶¶ 19, 27, 35)

## III. MOTION TO TRANSFER

### A. Standard

Section 1404(a) of Title 28 of the United States Code grants district courts the authority to transfer venue "[f]or the convenience of parties and witnesses, in the interests of justice . . . to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Much has been written about the legal standard for motions to transfer under 28 U.S.C. § 1404(a). *See, e.g., In re Link_A_Media Devices Corp.*, 662 F.3d 1221 (Fed. Cir. 2011); *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995); *Helicos Biosciences Corp. v. Illumina, Inc.*, 858 F. Supp. 2d 367 (D. Del. 2012).

Referring specifically to the analytical framework described in *Helicos*, the court starts with the premise that a defendant's state of incorporation has always been "a predictable, legitimate venue for bringing suit" and that "a plaintiff, as the injured party, generally ha[s] been 'accorded [the] privilege of bringing an action where he chooses.'" 858 F. Supp. 2d at 371 (quoting *Norwood v. Kirkpatrick*, 349 U.S. 29, 31 (1955)). Indeed, the Third Circuit in *Jumara* reminds the reader that "[t]he burden of establishing the need for transfer . . . rests with the movant" and that, "in ruling on defendants' motion, the plaintiff's choice of venue should not be lightly disturbed." 55 F.3d at 879 (citation omitted).

The Third Circuit goes on to recognize that,

2

[i]n ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum."

*Id.* (citation omitted).  The Court then describes some of the "many variants of the

private and public interests protected by the language of § 1404(a)." *Id.*

The private interests have included:  plaintiff's forum of preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses - **but only to the extent that the witnesses may actually be unavailable for trial in one of the fora**; and the location of books and records **(similarly limited to the extent that the files could not be produced in the alternative forum)**.

The public interests have included:  the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* (citations omitted) (emphasis added).

## B. Analysis

With the above "jurisdictional guideposts" in mind, the court turns to the "difficult

issue of federal comity" that transfer motions present. *E.E.O.C. v. Univ. of Pa.*, 850

F.2d 969, 976 (3d Cir. 1988).  Plaintiffs do not challenge that venue would also be

proper in the District of Utah.  As such, the court does not address this further. *See* 28

U.S.C. § 1404(a); (D.I. 16)

Both Delaware and Utah are legitimate forums in which to pursue the litigation at

bar.  Defendant is incorporated in Delaware and sells its products in various states

3

(including Delaware and Utah). A party's state of incorporation is a traditional and legitimate venue, as is the locus of a party's business activities. Defendant contends that plaintiffs' choice of forum should be given little to no deference as Delaware is not "home turf" for either plaintiff and non-party Bard Access Systems (incorporated in Utah and based in Salt Lake City) is "primarily responsible for devising [plaintiffs'] purported vascular access port technology." (D.I. 12 at 14) Defendant argues that the District of Utah is the preferred forum mainly because a prior suit, *C. R. Bard, Inc. v. AngioDynamics, Inc.*, Civ. No. 12-35, filed January 11, 2012 ("the Utah case"), is currently pending in the District of Utah and the cases involve "substantially overlapping subject matter." (D.I. 12 at 4) Defendant concludes that it is more convenient and efficient to litigate in Utah. Defendant's argument that plaintiffs are forum shopping due to "unfavorable rulings" is no different than plaintiffs' choosing a venue that it believes to be more favorable to its claims for whatever reason. *Cellectis S.A. v. Precision Biosciences, Inc.*, 858 F. Supp. 2d 376, 385 (D. Del. 2012). Given that "convenience" is separately considered in the transfer analysis, the court declines to elevate defendant's choice of venue over the choice of plaintiffs. That plaintiffs have historically been accorded the privilege of choosing their preferred venue for pursuing their claims remains a significant factor.

A claim for patent infringement arises wherever someone has committed acts of infringement, to wit, "makes, uses, offers to sell, or sells any patented invention" without authority. *See generally* 35 U.S.C. § 271(a); *Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998) (an infringement claim "arises out of instances of making, using, or selling the patented invention"). Defendant points

4

out that "for the period beginning on June 1, 2014, and ending on May 8, 2015, it sold only $372,711 worth of product in Delaware, while it sold nearly double that amount in Utah," presumably to argue that the alleged infringement is more properly focused in Utah. (D.I. 12 at 8)  Plaintiff responds that the populations of the two states are different, making the comparison of product sales immaterial to the determination of where the claims arose. (D.I. 16 at 10 n.4)  As defendant has sold product in Delaware, the asserted patent claims may be said to arise in Delaware.

The Third Circuit in *Jumara* indicated that, in evaluating the convenience of the parties, a district court should focus on the parties' relative physical and financial condition. Here, plaintiffs are much larger than defendant,[1] leading defendant to conclude that plaintiffs have "the endurance and resources to bring serial and parallel suits across multiple forums." (D.I. 12 at 15)  Defendant argues that it "would be significantly inconvenienced, should [this action] proceed in [the] District of Delaware, while [the Utah case] proceeds in the District of Utah." (D.I. 12 at 16)  In response, plaintiffs point out that defendant is "a large Delaware corporation with the resources to litigate in this district," which defendant has previously chosen to do.[2] (D.I. 16 at 10)

With respect to the convenience of the witnesses, it is not whether witnesses are inconvenienced by litigation but, rather, whether witnesses "actually may be unavailable for trial in one of the fora" that is the relevant consideration in this analysis. *Jumara*, 55 F.3d at 879. Defendant argues that certain inventors reside in Utah (and no longer work

---

[1] With plaintiffs reporting $294.5M of net income in the 2014 fiscal year and defendant $3.088M. (D.I. 12 at 2)

[2] Indeed, a search for "AngioDynamics" in the PACER Case Locator reveals 52 civil results, showing that defendant has litigated in some 19 states (including Delaware) as both plaintiff and defendant.

for plaintiffs). Additionally, "because inventors working in Utah developed the purported technology at issue at Bard's Utah-based subsidiary, other non-parties residing in Utah likely have knowledge about the alleged conception, reduction to practice, and inventorship of both sets of Bard patents." (D.I. 12 at 17) Defendant has not indicated that any particular witness who may be called upon to testify at trial would be unwilling to do so.[3]

The Third Circuit in *Jumara* advised that the location of books and records is only determinative if "the files c[an] not be produced in the alternative forum." *Jumara*, 55 F.3d at 879. Defendant argues that the location of the documentary and tangible evidence "likely exist at Bard Access System[s'] offices in Utah." (D.I. 12 at 18-19) Consistent with the realities of modern technology, this court's view is that virtually all businesses maintain their books and records in electronic format readily available for review and use at any location. Indeed, this is a logical conclusion in light of the fact that C. R. Bard, Inc. is located in New Jersey, its subsidiary Bard Peripheral Vascular, Inc., alleged to "manufacture[] and distribute[] implantable power-injectable port products, including PowerPort® products" is located in Arizona, which products are developed by Bard Access Systems in Utah. (D.I. 1; D.I. 14 at 18-19) With respect to trial, defendant fails to show how these documents or tangible evidence are incapable of being presented at trial in Delaware.

---

[3] With respect to trials, in the nine patent jury trials this judicial officer conducted between March 2010 and October 2011, an average of three fact witnesses per party appeared live for trial, with the average length of trial being 28 hours (with the parties often using less time than allocated, on average, 25 hours). Further, depositions in the cases over which this judicial officer presides are generally taken where the deponents reside or work. There is no suggestion that this case will be an exception.

While defendant argues that trial in both Utah and Delaware would present some overlap, the patents-at-issue in each case are different[4] and, significantly, the Utah case was stayed in December 2012 before any substantive action took place. (D.I. 16 at 16) In any event, less than 10% of cases are resolved through trial and defendant, through its counsel, is certainly capable of mitigating any such overlap.

With respect to administrative difficulty, trial in this case will be scheduled consistent with the parties' proposals. Local interest in deciding local controversies is not a dispositive factor, as patent litigation does not constitute a local controversy in most cases. Indeed, patent litigation implicates constitutionally protected property rights, is governed by federal law reviewed by a court of appeals of national (as opposed to regional) stature, and affects national (if not global) markets.[5] *See Cradle IP v. Texas Instruments, Inc.*, 923 F.Supp.2d 696, 700-01 (D. Del. 2013).

Defendant has the burden of persuading the court that transfer is appropriate, not only for its convenience but in the interests of justice. In the case-at-bar, plaintiffs chose a legitimate forum, defendant's state of incorporation. As is usual in these cases, the convenience factors do not weigh in favor of transfer because discovery is a local event

---

[4] The Utah patents are related and each claim priority to a common provisional application No. 60/685,815. The patents-in-suit are related to each other and claim priority to a common provisional application No. 60/685,309. Defendant asserts the patents in both cases are related and have "similarity in claim scope." (D.I. 20 at 4-5) Plaintiffs disagree, arguing that the two sets of patents "have different claims, specifications, prosecution histories, and priority dates." (D.I. 16 at 5)
[5] Defendant agrees that the remaining *Jumara* public interest factors—the enforceability of a judgment, the public policies of the fora, and the familiarity of the judge with state law—carry little weight in this transfer analysis, as they are mostly neutral or largely irrelevant to patent cases.

and trial is a limited event.[6]  Although Delaware is not the locus of any party's business activities, it is a neutral forum.  The court is not persuaded that transfer is warranted in the interests of justice.  Defendant's motion to transfer venue (D.I. 11) is denied.

## IV. MOTION TO DISMISS

### A. Standard of Review

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)).  Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11.  Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).  As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the

---

[6] Discovery is largely electronic, with depositions taking place where the deponents reside or work.  Moreover, most trials now are scheduled for less than seven days, and involve only a handful of live witnesses and a limited number of documents.

plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## B. 35 U.S.C. § 101

Section 101 provides that patentable subject matter extends to four broad categories, including: "new and useful process[es], machine[s], manufacture, or composition[s] of matter." 35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593, 601 (2010) ("*Bilski II*"); *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). A "process" is statutorily defined as a "process, art or method, and includes a new use of a known process, machine manufacture, composition of matter, or material." 35 U.S.C. § 100(b). The Supreme Court has explained:

> A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter

9

> to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.

*Diamond v. Diehr*, 450 U.S. 175, 182-83 (1981) (internal quotations omitted).

The Supreme Court recognizes three "fundamental principle" exceptions to the Patent Act's subject matter eligibility requirements: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601. In this regard, the Court has held that "[t]he concepts covered by these exceptions are 'part of the storehouse of knowledge of all men ... free to all men and reserved exclusively to none.'" *Bilski II*, 561 U.S. at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). "[T]he concern that drives this exclusionary principle is one of pre-emption," that is, "'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, — U.S. —, 134 S.Ct. 2347, 2354 (2014) (citing *Bilski II*, 561 U.S. at 611-12 and *Mayo Collaborative Servs.v. Prometheus Labs., Inc.*, 566 U.S. —, 132 S.Ct. 1289, 1301 (2012)).

Although a fundamental principle cannot be patented, the Supreme Court has held that "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection," so long as that application would not preempt substantially all uses of the fundamental principle. *Bilski II*, 561 U.S. at 611 (quoting *Diehr*, 450 U.S. at 187) (internal quotations omitted); *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) ("*Bilski I*"). The Court has described the

> framework for distinguishing patents that claim laws of nature, natural
> phenomena, and abstract ideas from those that claim patent-eligible
> applications of those concepts. First, we determine whether the claims at
> issue are directed to one of those patent-ineligible concepts. If so, we
> then ask, "[w]hat else is there in the claims before us?" To answer that
> question, we consider the elements of each claim both individually and "as
> an ordered combination" to determine whether the additional elements
> "transform the nature of the claim" into a patent-eligible application. We
> have described step two of this analysis as a search for an "'inventive
> concept'"—i.e., an element or combination of elements that is "sufficient to
> ensure that the patent in practice amounts to significantly more than a
> patent upon the [ineligible concept] itself."

*Alice*, 134 S.Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1294, 1296-98).[7]

"[T]o transform an unpatentable law of nature into a patent-eligible application of

such a law, one must do more than simply state the law of nature while adding the

words 'apply it.'" *Mayo*, 132 S.Ct. at 1294 (citing *Gottschalk v. Benson*, 409 U.S. 63,

71-72 (1972)) (emphasis omitted). It is insufficient to add steps which "consist of well-

understood, routine, conventional activity," if such steps, "when viewed as a whole, add

nothing significant beyond the sum of their parts taken separately." *Mayo*, 132 S. Ct. at

1298. "Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient

to transform an unpatentable law of nature into a patent-eligible application of such a

law." *Id.* (citations omitted). Also, the "prohibition against patenting abstract ideas

'cannot be circumvented by attempting to limit the use of the formula to a particular

technological environment' or adding 'insignificant post-solution activity.'" *Bilski II*, 561

---

[7] The machine-or-transformation test still may provide a "useful clue" in the second step
of the *Alice* framework. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir.
2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life Assurance
Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). A claimed process can be patent-
eligible under § 101 if: "(1) it is tied to a particular machine or apparatus, or (2) it
transforms a particular article into a different state or thing." *Bilski I*, 545 F.3d at 954,
*aff'd on other grounds, Bilski II*, 561 U.S. 593.

U.S. at 610-11 (citation omitted). For instance, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (citations omitted).

Because computer software comprises a set of instructions,[8] the first step of *Alice* is, for the most part, a given; i.e., computer-implemented patents generally involve abstract ideas. The more difficult part of the analysis is subsumed in the second step of the *Alice* analysis, that is, determining whether the claims "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," or whether the claims are directed to "a problem specifically arising in the realm of computer technology" and the claimed solution specifies how computer technology should be manipulated to overcome the problem. *DDR Holdings, LLC v. Hotels.Com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

In *DDR*, for example, the claims at issue involved computer technology directed at retaining website visitors.[9] In its analysis, the Federal Circuit rejected the notion that the pre-Internet analog to the claims at issue ended the inquiry, explaining that while

---

[8] Or, to put it another way, software generally comprises a method "of organizing human activity." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-68 (Fed. Cir. 2015) (citing *Alice*, 134 S.Ct. 2351-52, and *Bilski II*, 561 U.S. at 599).
[9] In *DDR*, representative claim 19 of the '399 patent recites:

> A system useful in an outsource provider serving web pages offering commercial opportunities, the system comprising:

the "store within a store" concept . . . may have been well-known by the relevant time frame, that practice did not have to account for the ephemeral nature of an Internet "location" or the near-instantaneous transport between these locations made possible by standard Internet communication protocols, which introduces a problem that does not arise in the "brick and mortar" context.

773 F.3d at 1258. In other words, "[a]lthough the claims address[ed] a business

challenge . . ., it [was] a challenge particular to the Internet." *Id.* at 1257. The Court

concluded that, under any of the characterizations of the abstract idea, the claims

satisfied step two of *Alice* as being

different enough in substance from those in *Ultramercial* because they do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). Unlike the

---

(a) a computer store containing data, for each of a plurality of first web pages, defining a plurality of visually perceptible elements, which visually perceptible elements correspond to the plurality of first web pages;

(i) wherein each of the first web pages belongs to one of a plurality of web page owners;

(ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and

(iii) wherein the selected merchant, the out-source provider, and the owner of the first web page displaying the associated link are each third parties with respect to one other;

(b) a computer server at the outsource provider, which **computer server** is coupled to the computer store and **programmed to**:

(i) receive from the web browser of a computer user a signal indicating activation of one of the links displayed by one of the first web pages;

(ii) automatically identify as the source page the one of the first web pages on which the link has been activated;

(iii) in response to identification of the source page, automatically retrieve the stored data corresponding to the source page; and

(iv) using the data retrieved, automatically generate and transmit to the web browser a second web page that displays:

(A) information associated with the commerce object associated with the link that has been activated, and

(B) the plurality of visually perceptible elements visually corresponding to the source page.

773 F.3d at 1249-50 (emphasis added).

13

claims in *Ultramercial*, the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result – a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink. . . .

In sum, [U.S. Patent No. 7,818,399]'s claims are unlike the claims in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp* that were found to be "directed to" little more than an abstract concept. To be sure, the '399 patent's claims do not recite an invention as technologically complex as an improved, particularized method of digital data compression. But nor do they recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operation, such as the claims in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp*.

*Id.* at 1258-59 (citing *Alice*, 134 S.Ct. at 2359; *Ultramercial*, 772 F.3d 709, 714-16 (Fed.

Cir. 2014); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014);

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344-45

(Fed. Cir. 2013); *Bancorp*, 687 F.3d at 1277-78); *but see Dealertrack, Inc. v. Huber*, 674

F.3d 1315, 1331-35 (Fed. Cir. 2012).

In *DDR*, the analytical framework (in the context of computer-implemented

inventions) was articulated so as to require that the inventive concept "recite a specific

way" to solve a "particular Internet-centric problem," with the claimed solution being

"necessarily rooted in computer technology," so that the result "is not merely the routine

or conventional use of the Internet." 773 F.3d at 1257, 1259.  Since providing that

explanation, the Federal Circuit has not preserved the validity of any other computer-

implemented invention under § 101.[10]  For instance, in *Intellectual Ventures*, a case that

---

[10] *See, e.g., Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014); *Allvoice Devs. US, LLC v. Microsoft Corp.*, 612 Fed. Appx. 1009 (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir. 2015); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir.

also presented claims directed at websites,[11] the Court explained that, "[a]t step one of the *Alice* framework, it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a '"fundamental . . . practice long prevalent in our system."'" *Intellectual Ventures*, 792 F.3d at 1369 (citing *Alice*, 134 S. Ct. at 2356). The Court characterized the claims at issue as relating to "customizing information based on (1) information known about the user and (2) navigation data." *Id.* Likening "[t]his sort of information tailoring" to "providing different newspaper inserts based upon the location of the individual," *id.*, the Court concluded that the first aspect of the inventive concept was an abstract idea. The second aspect of the inventive concept, using "navigation data (i.e., information relating to when the user navigated to the website) to 'customize' the website," *id.*, the Court again concluded that "[t]ailoring information based[, e.g.,] on the time of day of viewing is also an abstract, overly broad concept long-practiced in our society." *Id.* at 1370.[12]

---

2015); *Intellectual Ventures*, 792 F.3d 1363; *Versata Dev. Grp., Inc. v. SAP America, Inc.*, 793 F.3d 1306 (Fed. Cir. 2015).

[11] Representative claim 1 of U.S. Patent No. 7,603,382 recites:

> A system for providing web pages accessed from a web site in a manner
> which presents the web pages tailored to an individual user, comprising:
>  an interactive interface configured to provide dynamic web site
> navigation data to the user, the interactive interface comprising:
>  a display depicting portions of the web site visited by the user as a
> function of the web site navigation data; and
>  a display depicting portions of the web site visited by the user as a
> function of the user's personal characteristics.

*Intellectual Ventures*, 792 F.3d at 1368.

[12] In this regard, the observation made by the district court in *Paone v. Broadcom Corp.*, Civ. No. 15-0596, 2015 WL 4988279 (E.D.N.Y. Aug. 19, 2015), is worth noting, that (in the context of encryption technology) it was of

15

Turning to the second step of *Alice*, the *Intellectual Ventures* Court concluded

that the claims at issue presented no inventive concept "that would support patent

eligibility."[13]  *Id.* at 1370.  The Federal Circuit explained:

> Steps that do nothing more than spell out what it means to "apply it on a
> computer" cannot confer patentability. . . .  Requiring the use of a
> computer" cannot confer patentability. . . .  Requiring the use of a
> "software" "brain" "tasked with tailoring information and providing it to the
> user" provides no additional limitation beyond applying an abstract idea,
> restricted to the Internet, on a generic computer.

*Id.* at 1370-71.  In distinguishing *DDR*, the *Intellectual Ventures* Court offered the

following analysis:

> The patent at issue in [*DDR*] dealt with a problem unique to the Internet:
> Internet users visiting one web site might be interested in viewing products
> sold on a different web site, but the owners of the first web site did not
> want to constantly redirect users away from their web site to a different
> web site. . . .  The claimed solution used a series of steps that created a
> hybrid web page incorporating "look and feel" elements from the host web
> site with commerce objects from the third-party web site. . . .  The patent
> at issue in *DDR* provided an Internet-based solution to solve a problem
> unique to the Internet that (1) did not foreclose other ways of solving the
> problem, and (2) recited a specific series of steps that resulted in a
> departure from the routine and conventional sequences of events after the
> click of a hyperlink advertisement. . . .  The patent claims [in *Intellectual
> Ventures*] do not address problems unique to the Internet, so *DDR* has no
> applicability.[14]

---

no moment that "[e]ncryption, in general, represents a basic building block
of human ingenuity that has been used for hundreds, if not thousands, of
years."  That is because [U.S. Patent No. 6,259,789] does not claim a
process that can or does involve the encryption of data for some purpose
that is otherwise abstract.  Rather, it claims a specific method of doing so.

*Id.* at *7 (citation omitted) (emphasis omitted).
[13] Despite the "dynamic presentation of data – that is, . . . the claimed invention in 'real
time' customizes the web page based on the information it knows about the particular
viewer" – and despite the claimed "interactive interface," which was "broadly construed
by the district court to mean 'a selectively tailored medium by which a web site user
communicates with a web site information provider.'"  *Intellectual Ventures*, 792 F.3d at
1369-70.
[14] But recall the "store within a store" pre-Internet analog rejected in *DDR*.

*Id.* at 1371 (citations omitted).

In reviewing post-*Alice* cases such as *DDR* and *Intellectual Ventures*, the court is struck by the evolution of the § 101 jurisprudence, from the complete rejection of patentability for computer programs[15] to the almost complete acceptance of such,[16] to the current (apparent) requirements that the patent claims in suit (1) disclose a problem "necessarily rooted in computer technology," and (2) claim a solution that (a) not only departs from the "routine and conventional" use of the technology, but (b) is sufficiently specific so as to negate the risk of pre-emption.  *See DDR*, 773 F.3d at 1257; *Intellectual Ventures*, 792 F.3d at 1371.  In other words, even though most of the patent claims now being challenged under § 101 would have survived such challenges if mounted at the time of issuance, these claims are now in jeopardy under the heightened specificity required by the Federal Circuit post-*Alice*.  Moreover, it is less than clear how a § 101 inquiry that is focused through the lens of specificity can be harmonized with the roles given to other aspects of the patent law (such as enablement under § 112 and non-obviousness under § 103),[17] especially in light of the Federal

---

[15] *See, e.g.*, 33 Fed. Reg. 15581, 15609-10 (1968), and Justice Steven's dissent in *Diehr*, whose solution was to declare all computer-based programming unpatentable, 450 U.S. at 219.

[16] *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998), *abrogated by Bilski I*, in which "a computer-implemented invention was considered patent-eligible so long as it produced a 'useful, concrete and tangible result.'" *DDR*, 773 F.3d at 1255 (citing *State Street Bank*, 149 F.3d at 1373).

[17] Indeed, Judge Plager, in his dissent in *Dealertrack*, suggested that,

> as a matter of efficient judicial process I object to and dissent from that part of the opinion regarding the '427 patent and its validity under § 101, the section of the Patent Act that describes what is patentable subject matter.  I believe that this court should exercise its inherent power to control the processes of litigation . . ., and insist that litigants, and trial courts, initially address patent invalidity issues in infringement suits in

17

Circuit's past characterization of § 101 eligibility as a "coarse" gauge of the suitability of

broad subject matter categories for patent protection. *Research Corp. Techs., Inc. v.*

*Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010). Given the evolving state of the

law, the § 101 analysis should be, and is, a difficult exercise.[18] At their broadest, the

various decisions of the Federal Circuit[19] would likely ring the death-knell for patent

protection of computer-implemented inventions,[20] a result not clearly mandated (at least

not yet). On the other hand, to recognize and articulate the requisite degree of

specificity - either in the equipment used[21] or the steps claimed[22] - that transforms an

abstract idea into patent-eligible subject matter is a challenging task. In trying to sort

---

terms of the defenses provided in the statute: "conditions of patentability," specifically §§ 102 and 103, and in addition §§ 112 and 251, and not foray into the jurisprudential morass of § 101 unless absolutely necessary.

*Dealertrack*, 674 F.3d at 1335. *But see CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1277 (Fed. Cir. 2013), *aff'd*, 134 S. Ct. 2347 (2014).

[18] And, therefore, not an exercise that lends itself to, e.g., shifting fees pursuant to 35 U.S.C. § 285.

[19] *See, e.g., Dealertrack*, where the claim was about as specific as that examined in *DDR*, yet the Federal Circuit found the patent deficient because it did "not specify how the computer hardware and database [were] **specially programmed** to perform the steps claimed in the patent," 674 F.3d at 1333-34 (emphasis added). The disclosure of such programming details would likely nullify the ability of a patentee to enforce the patent, given the ease with which software can be tweaked and still perform the desired function.

[20] Ironically so, given the national concerns about piracy of American intellectual property.

[21] *See, e.g., SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010), a case where the Federal Circuit found that a GPS receiver was "integral" to the claims at issue. The Court emphasized that a machine will only "impose a meaningful limit on the scope of a claim [when it plays] a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *Id.* at 1333.

[22] *See, e.g., DDR*, 773 F.3d at 1257-58; *TQP Dev., LLC v. Intuit Inc.*, Civ. No. 12-180, 2014 WL 651935 (E.D. Tex. Feb. 19, 2014); *Paone*, 2015 WL 4988279.

through the various iterations of the § 101 standard, the court looks to *DDR* as a
benchmark; i.e., the claims (informed by the specification) must describe a problem and
solution rooted in computer technology, and the solution must be (1) specific enough to
preclude the risk of pre-emption, and (2) innovative enough to "override the routine and
conventional" use of the computer. *DDR*, 773 F.3d at 1258-59. The pre-emption
concern is generally amenable to review in the context of a motion to dismiss or for
judgment on the pleadings. The second requirement, which may well involve issues of
fact relating to the state of the art in the technological environment involved, is more
appropriately addressed after discovery in the context of a motion for summary
judgment.

### C. Claim Construction

The Federal Circuit has "never set forth a bright line rule requiring district courts
to construe claims before determining subject matter eligibility." *Ultramercial, LLC v.
Hulu, LLC*, 657 F.3d 1323, 1325 (Fed. Cir. 2011), vacated sub nom. *WildTangent*, 132
S.Ct. 2431 (2012). Given the gate-keeping nature of § 101, "claim construction may not
always be necessary for a § 101 analysis." *Ultramercial*, 657 F.3d at 1325 (citing *Bilski
II*, 561 U.S. at 611 (finding subject matter ineligible for patent protection without claim
construction)). In *Bancorp*, the Federal Circuit reiterated that "claim construction is not
an inviolable prerequisite to a validity determination under § 101," but it may be
"desirable—and often necessary—to resolve claim construction disputes prior to a §
101 analysis, for the determination of patent eligibility requires a full understanding of
the basic character of the claimed subject matter." *Bancorp*, 687 F.3d at 1273-74. In
advocating for judicial efficiency, the Federal Circuit recently stated:

19

> From a practical perspective, addressing section 101 at the outset of litigation will have a number of salutary effects. First, it will conserve scarce judicial resources. Failure to recite statutory subject matter is the sort of "basic deficiency," that can, and should, "be exposed at the point of minimum expenditure of time and money by the parties and the court," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 . . . (2007) (citations and internal quotation marks omitted). Here, for example, the district court properly invoked section 101 to dismiss Ultramercial's infringement suit on the pleadings. No formal claim construction was required because the asserted claims disclosed no more than "an abstract idea garnished with accessories" and there was no "reasonable construction that would bring [them] within patentable subject matter." *Ultramercial, LLC v. Hulu, LLC*, No. 09–CV–6918, 2010 WL 3360098, at \*6 (C.D. Cal. Aug. 13, 2010).

*Ultramercial*, 772 F.3d at 718-19.

Defendant submits that claim construction is unnecessary to resolve the § 101 issue, arguing that the claims define a conventional "access port." (D.I. 10 at 20) Plaintiffs respond to the patent eligibility arguments without presenting issues of claim construction. In addressing the comparison of construed claims against prior art for an anticipation and obvious analysis, plaintiffs state that "[a]t the very least, the parties cannot even agree on the construction of the term "access port"—the key limitation and heart of the patents[-in-suit]." (D.I. 18 at 20) Plaintiffs, however, do not offer a proposed construction or highlight the ambiguity of the term. This term is further discussed below.

## D. The Patents-in-Suit

The specification[23] of the patents-in-suit explains that a "wide variety of medical procedures require infusion of a fluid into a patient," for example, computed tomography (CT), an imaging technology. (1:20-27) Power injector systems, such as those

---

[23] As the specifications are identical in material respects, the court cites to the '478 patent unless otherwise specified.

commercially available from Medrad, Inc., may be used to inject contrast media at a high pressure into a peripherally inserted intravenous line. (1:33-39) Because the systems require high pressure, "[r]uptures can occur when the injection pressure exceeds the tolerance of the vascular access device(s)." (2:22-26) Subcutaneous vascular access ports may be implanted within the body and used to infuse fluids. (2:39-46) "Such access ports typically include a cannula-impenetrable housing which encloses one or more fluid cavities or reservoirs and defines for each such fluid cavity an access aperture communicating through the housing." (2:47-51) "[C]onventional access ports and attendant infusion systems have not been suitable for performing power injection." (3:1-3)

The specification discloses that a "vascular access port may be provided and a fluid may be caused to flow through the access port at a rate of at least about 1 milliliter per second." (3:14-17) "Another aspect of the instant disclosure relates to an access port for providing subcutaneous access to a patient." (3:23-24) The specification describes different identification features including "one feature of an access port housing," "a radiographic marker," "an observable pattern, symbol, marker, or other indicium," or "a visually perceivable feature" such as "one color, at least one symbol, at least one typographical character (e.g., a letter, a number, etc.), a pattern, or any other indicium." (26:17-18; 53-67)

The '478 patent is directed to "[m]ethods of performing a power injection procedure." (Abstract) Claim 1 of the '478 patent[24] recites:

A method of performing a power injection procedure, comprising:

---

[24] Which defendant offers as a representative claim. Plaintiffs do not dispute this assertion, but point to claim 8 to highlight their arguments.

21

> taking an x-ray of a subcutaneously implanted access port in a patient to determine whether the access port includes a radiographic feature indicating that the access port is suitable for flowing fluid at a rate of at least 1 milliliter per second through the access port, the access port defining one or more fluid reservoirs, each fluid reservoir accessible through a cannula-penetrable septum;

> identifying the indicating radiographic feature on the x-ray; and

> flowing a fluid through the access port at a rate of at least 1 milliliter per second.

(30:58-31:4) The '417 and '460 patents are directed to "[a]ssemblies for identifying a

power injectable vascular access port." ('417 patent, abstract) Claim 1 of the '417

patent recites:

> An assembly for identifying a power injectable vascular access port, comprising:

> a vascular access port comprising a body defining a cavity, a septum, and an outlet in communication with the cavity;

> a first identifiable feature incorporated into the access port perceivable following subcutaneous implantation of the access port, the first feature identifying the access port as suitable for flowing fluid at a fluid flow rate of at least 1 milliliter per second through the access port;

> a second identifiable feature incorporated into the access port perceivable following subcutaneous implantation of the access port, the second feature identifying the access port as suitable for accommodating a pressure within the cavity of at least 35 psi, wherein one of the first and second features is a radiographic marker perceivable via x-ray; and

> a third identifiable feature separated from the subcutaneously implanted access port, the third feature confirming that the implanted access port is both suitable for flowing fluid at a rate of at least 1 milliliter per second through the access port and for accommodating a pressure within the cavity of at least 35 psi.

('417 patent, 30:51-31:6) Claim 1 of the '460 patent recites:

> A system for identifying a power injectable vascular access port, comprising:

22

a vascular access port comprising a body defining a cavity, a septum, and an outlet in communication with the cavity;

a first identifiable feature incorporated into the access port perceivable following subcutaneous implantation of the access port, the first feature comprising a radiographic marker identifying the access port as suitable for flowing fluid at a fluid flow rate of at least 1 milliliter per second through the access port; and

a second identifiable feature separated from the subcutaneously implanted access port, the second feature visually observable following subcutaneous implantation to confirm that the implanted access port is suitable for flowing fluid at a rate of at least 1 milliliter per second through the access port.

('460 patent, 30:5167)

### E. Analysis

#### 1. The '478 patent

Applying the analytical framework of *Alice*, the court first "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts," namely, laws of nature, natural phenomena, and abstract ideas. 134 S.Ct. at 2354-55. Defendant argues that the method claims "merely describe the abstract mental step of identifying the allowable/intended flow rate of an implanted access port directly from an x-ray image of the implanted port." (D.I. 10 at 11) Defendant compares this "mental step" to the "abstract mental process of 'comparing' and 'analyzing' two gene sequences" in *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755 (Fed. Cir. 2014). *Id.* at 763 (citing *Association for Molecular Pathology v. Myriad*, 689 F.3d 1303, 1334 (Fed. Cir. 2012)); *see also, PerkinElmer, Inc. v. Intema Ltd.*, 496 F. App'x 65 (Fed. Cir. 2012) (holding that the recited method step of "determining the risk of Down's syndrome by comparing" screening markers to be an "ineligible mental step"). Plaintiffs

23

attempt to distinguish the claim at bar, pointing out that the method claims "are grounded in the same meaningful limitations as the product claims," i.e., the power injectable access port. (D.I. 18 at 13) The first step of claim 1 of the '478 patent involves looking at an x-ray to determine whether the access port carries an identification feature and identifying such feature. While the claim is limited by the presence of the access port, such limitation does not change the conclusion that the "determining" step is an abstract idea.

Turning to the second step of *Alice*, defendant argues that the method claims recite everyday activity performed by medical professionals: "taking an x-ray" and "flowing a fluid" in claim 1 and the additional pre-identification steps of "providing an access port" and "implanting the access port" in claim 8. (D.I. 10 at 12) Moreover, the method claims recite minimal structural attributes of conventional/generic access ports and such limitations "add nothing to distinguish power-injectable access ports over any other kind of access ports." (*Id.* at 16-17) In other words, the claims do not actually recite a single structural element that is inventive or distinctive of power injection. (D.I. 21 at 2) Defendant further argues that confining the claims to the field of power injection does not render the claims patent eligible. "The claims recite only this same 'conventional' port structure and therefore would cover the very prior art access ports criticized in the patents, merely through the application of a label to indicate capability for use in power injection." (*Id.* at 4)

In response, plaintiffs assert that the claims are limited to power injectable access ports with distinct identifiable features. Moreover, the additional limitations of the claims amount to an inventive concept, as the claims solve a problem specific to

24

power injectable access ports. (D.I. 18 at 17-18) Having considered the parties' arguments, the court concludes that the arguments presented conflate the § 101 analysis with anticipation and obviousness arguments for which the court routinely allows full discovery and makes its decision based on a full record. Such a record would include claim construction, which might be necessary to resolve plaintiffs' contention that the term "access port" is the key limitation and heart of the patents-in-suit. Therefore, the court declines to dismiss on this record.

### 2. The '417 and '460 patents

"[S]ystem claims that closely track method claims and are grounded by the same meaningful limitations will generally rise and fall together," as "the system claim essentially implement[s] the process of the method claim on a general purpose computer." *Accenture*, 728 F.3d at 1341 (citations omitted). Therefore, "none of the recited hardware offers a meaningful limitation beyond generally linking 'the use of the [method] to a particular technological environment,' that is, implementation via computers." *Id*. (citation omitted). In the case at bar, the claims recite that the identifiable features are "incorporated into the access port" to perform the function of identifying an implanted access port as suitable for the allowable/intended flow rate. Defendant again concludes that the limitations provide no distinction unique to power-injectable access ports. While the system claims purport to be directed to "identifying a power injectable vascular access port" and recite flow rates and/or pressures purportedly associated with power injection," these features are well-known in the art.

(D.I. 10 at 19) Plaintiffs respond[25] that the asserted claims are product claims directed to a particular access port that is used specifically for power injection. (D.I. 18 at 10-11) As with the method claims discussed above, the court finds such arguments more properly reserved to analysis on a full record and declines to dismiss.

## V. CONCLUSION

For the foregoing reasons, the court denies defendant's motion to dismiss (D.I. 9) and the motion to transfer (D.I. 11). Plaintiffs' motion for leave to file a sur-reply (D.I. 22) is denied as moot. An appropriate order shall issue.

---

[25] Although plaintiffs' arguments in its opposition brief were presented primarily in the context of sections of the MPEP (which defendant points out as superseded), plaintiffs' explanations were sufficiently consistent with an *Alice* analysis. As such, the court declines to address the motion for leave to file a sur-reply, which reframes plaintiffs' arguments regarding the system claims to align with the *Alice* analysis. No substantive arguments were added.